UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------:

Samaad Bishop,

                                    Plaintiff,

City of New York,
NYPD Sergeant Ryan, Shield No. 2840,
NYPD Police Officer Lorenne, Shield No. 8554, and
NYPD Police Officer, Diaz, Shield No. 276,

                                   Defendants.

-----------------------------------------------------------------:

**Index No.:**

**VERIFIED COMPLAINT
FOR VIOLATIONS OF 42 USC § 1983
THE FOURTH AMENDMENT OF THE
UNITED STATES CONSTITUTION
AND RELATED CLAIMS**

**PLAINTIFF DEMANDS JURY TRIAL
ON ALL ISSUES SO TRIABLE**

## SUMMARY

1. From January 2002 to June 2012 the NYPD conducted nearly 4.4 million "stop-and-frisk" searches, with the vast majority of said stops involving African-American males[1]. While the U.S. Supreme Court requires that an officer conducting a stop-and-frisk have reason to believe an individual is armed and dangerous, here in New York, not even two percent of stop-and-frisks result in the recovery of a weapon. In stark contrast to the program's professed purpose, which is to combat illegal guns on the streets of new York. NYPD officers routinely stop, seized and frisks African-Americans citizens, including BISHOP, without individualized suspicion of unlawful activity and make arrests or issue summonses without probable cause of criminal activity.

2. It is clear that either NYPD training is so poor that its officers are mistaken on their predictions of weapons possessions 79 out of 80 times, or that NYPD custom and/or policy allows and encourages officers to utilize stop-and-frisk searching for purposes other than ensuring the safety of its officers (such as quotas), or for no purpose at all[2].

3. This civil action seeks to vindicate violation of Plaintiff SAMAAD BISHOP'S fundamental Constitutional and Civil Rights at the hands of two individual NYPD police officers and by the municipal Defendants CITY NEW YORK's: **(1)** utter failure to properly train said two police officers

---

[1] This number is based on self-reported statistics by the NYPD.

[2] This number is based on self-reported statistics by the NYPD.

on fundamental Constitutional and Civil Rights;  **(2)** deliberate indifferent inaction to the protection Plaintiffs' fundamental Constitutional and Civil Rights; and **(3)** the failure to create prophylactic and pre-deprivation measure to prevent the abridgment of Plaintiffs' fundamental Constitutional and Civil Rights.

4.     Plaintiff SAMAAD BISHOP a bring this civil action for compensatory damages, injunctive relief, declaratory relief, punitive damages, and attorneys' fees, because Defendants jointly and severally deprived them of his rights, privileges, and immunities secured by, Title 42 U.S.C. § 1983, Title 42 U.S.C. § 1986 *et. seq.,* and the Fourth Amendment to the United States Constitution.

## JURY DEMAND

5.     Plaintiff BISHOP  respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

### Plaintiff

6.     Plaintiff  SAMAD BISHOP is an African-American male a citizen of the United  States, and at all relevant times a resident of the City and State of New York.

### Defendants

7.     At the time of the commencement of this action, Defendant CITY OF NEW YORK is and was at all times relevant herein a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY OF NEW YORK assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risk attaches to the public consumers of the services provided by the New York City Police Department.

8.     Defendant Sergeant Ryan, Shield No. 2840 ("Sgt. Ryan"), at all relevant times is or was an employee/police officer with the City of New York Police Department. He is sued in his individual and official capacities. For identification purposes seized, searched and frisked BISHOP in Queens County on September 22, 2011.

9.     Defendant P.O. Lorenne, Shield No. 8554 ("P.O. Lorenne")  at all relevant times is or was an employee/police officer with the City of New York Police Department. She is sued in her individual

2

and official capacities. For identification purposes seized, searched and frisked BISHOP in Queens County on September 22, 2011.

10. Defendant P.O. Diaz, Shield No. 276, at all relevant times is or was an employee/police officer with the City of New York Police Department. He is sued in his individual and official capacities. For identification purposes seized, searched and frisked BISHOP in Queens County on September 22, 2011.

## JURISDICTION

11. Plaintiff bring this action for compensatory damages, punitive damages, and attorneys' fees pursuant to Title 42 USC § 1981 *et. seq.*; Title 42 USC § 1981; Title 42 USC § 1981; Title 42 USC § 1985 *et. seq.*; Title 42 USC § 1986 *et. seq.*, and Title 42 USC § 1988 *et. seq.* for violations of his Civil Rights, as said rights are secured by said statutes and the Constitutions of the United States.

12. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343.

## VENUE

13. Venue is properly laid in the Southern District of New York under 28 USC § 1391(b) in that this is the District in which the claims arose.

## ALLEGATIONS OF FACT

14. On September 11, 2011, while walking to meet a client for a real estate closing in Queens County, a City of New York marked police with its breaks loudly coming to a screeching halt, suddenly stopped in front of Plaintiff. In a sudden burst Defendants Sgt. Ryan, P.O. Lorenne and P.O. Diaz jumped out of said police car and without probable cause or reasonable suspicion ordered Plaintiff to "STOP"!

15. Plaintiff was startled and recoiled in fear in response to Defendants sudden stop and orders to "STOP" as Plaintiff thought he was being attacked by gang

16. Plaintiff asked Defendants Sgt. Ryan, P.O. Lorenne and P.O. Diaz was there a crime reported? Said Defendants replied "No".

17. Plaintiff asked Defendants Sgt. Ryan, P.O. Lorenne and P.O. Diaz if he was suspected of committing a crime? Said Defendants replied "No".

3

## THE CITY OF NEW YORK DISCRIMINATORY "STOP & FIRSK" POLICY

39. In August 2013, United States District Judge Shira Scheindlin, ruled that the New York Police Department violated the Constitution with its so-called stop-and-frisk program and that's said illegal program amounted to "indirect racial profiling" by targeting blacks and Hispanics disproportionate to their populations.

40. Prior to the Memorandum and Order of Judge that found "stop-and-frisk" unconstitutional, the NYPD's practice, and abuse, of "stop-and-frisk" searches has occurred for no less than decades, and the NYPD has been on notice of such.

41. Statistics released by the NYPD, year after year, admit to over 500,000 stop-and-frisks conducted annually, reaching an all-time high in 2011 of **684,330**. See **Exhibit A**, "Critics Assail NYPD Stop-and-Frisk Tactics,"The Wall Street Journal. http://blogs.wsj.com/metropolis/2012/02/14/critics-assail-nypd-stop-and-frisk-tactics/, **Exhibit B**, "NYPD Stop-and-Frisk Statistics, 2009 and 2010," Center for Constitutional Rights. http://ccrjustice.org/files/CCR_Stop_and_Frisk_Fact_Sheet.pdf.

42. The population of New York City is approximately 8,000,000 people.

43. Based on the above, one's odds of getting stopped-and-frisked by the NYPD in a given year are approximately 1 in 12.

44. However, those odds are drastically changed when taking race into account – black people, for example, are nearly ten times as likely to be stopped-and-frisked as white people. See **Exhibit B**.

45. The high number of stop-and-frisk searches can be explained, at least in part, by NYPD supervisors setting quotas or quota-like "performance goals."

46. . These quotas are often times treated as more important than respecting the rights of the public, by both supervisors and "street cops.".

47. For example, in 2010, a whistleblower NYPD officer recorded his commanding officer directing him as follows: "Any roving bands – you hear me – roving bands of more than two or three people, I want them stopped. Cuffed. Throw them in here, run some warrants. You're on a foot

4

post? Fuck it. Take the first guy you've got, lock them all up." See Exhibit C, "Is That a Tape Recorder in Your Pocket, or Are You Just Unhappy to See Me?" This American Life. http://www.thisamericanlife.org/radio- archives/episode/414/transcript.

48. The same whistleblower also recorded the following statement: "I see eight fucking summonses for a 20-day period or a month. If you mess up, how the hell do you want me to do the right thing by you? You come in, five parkers, three A's, no C's, and the only 250 you do is when I force you to do overtime? I mean it's a two-way street out here." See Exhibit D, "The NYPD Tapes: Inside Bed-Stuy's 81st Precinct," p. 3. The Village Voice. http://www.villagevoice.com/2010-05-04/news/the-nypd-tapes-inside-bed-stuy-s- 81st-precinct/3/.

49. In the above quotation, "250" is a reference to Form UF-250, a report filled out each time a stop-and-frisk is performed.

50. Despite the lawful purpose of a stop-and-frisk necessarily being the detection of weapons, only 1.25% of these searches actually yielded a weapon. See **Exhibit B**.

51. Approximately 90% of those stopped-and-frisked were not taken into custody or even issued a summons – in other words, were engaged solely in completely lawful behavior -- and naturally a portion of the remaining 10% would find their cases dismissed.

52. Following the shooting death of Amadou Diallo, an unarmed man killed by NYPD officers in 1999, the New York State Attorney General issued a detailed report examining NYPD stop-and-frisk tactics which, among other things, concluded that no lawful basis for the stop had been recorded by officers in nearly 40% of the stops examined.

53. Based upon the NYPD-released statistics, published whistleblower reports, and Attorney General report, the NYPD was, or should have been, aware of the abuse of stop-and- frisks, and instead of correcting the problem, the quantity of stop-and-frisks has increased by a rate of 14% in the last year, and over 100% since 2004. See **Exhibit A**.

_____

Samaad Bishop